```
  1   381
 88   782
  1   381
 99   416
  1   381
f112  535
  1   381
a110  870
```

No. 60.—John Liptrot, administrator of Camilla Talton, plain tiff in error, vs. James Holmes, defendant in error.

To enable a plaintiff to maintain *trover*, he must have either a general or special property in the chattel: the actual possession, or the right of possession.

The whole interest of an intestate's personal estate vests in his administrator, on the grant of letters of administration; and such grant has relation to the time of the intestate's death.

The action of *trover* being founded on a conjunct right of property and possession, any act of the defendant which negatives, or is inconsistent with, such right, amounts, in law, to a conversion.

On the death of a *feme covert*, intestate, her separate estate vests in her legal representative; and he can maintain *trover* therefor, even where there has been a trustee appointed, for the sole purpose of protecting such property against the marital rights of the husband, during the coverture; the trust being considered as *executed* whenever the coverture ceases to exist. The interest of the trustee in the property is determined by the coverture, when there is no other object to be accomplished by his appointment.

This was an action of trover and conversion, tried before Judge Floyd, in the Superior Court of the county of Houston, on the appeal, at April Term, 1846. The suit was brought by the plaintiff in error against the defendant in error for the recovery of damages for the alleged conversion of fourteen slaves.

The defendant in error pleaded the general issue, and also a special plea, alleging, that if the slaves sued for were the separate and trust property of the plaintiff's intestate, in her lifetime, the same slaves were reduced to possession by Henry Talton, the husband of said Camilla Talton, the plaintiff's intestate; and that the said Henry Talton being

in the possession of said slaves before and at the time of the death of said Camilla, afterwards departed this life so possessed, and so in the enjoyment thereof. And the defendant in error, and Narcissa J. Talton, the widow of said Henry, obtained letters of administration on the estate of said Henry; and, as such administrator and administratrix, they received said slaves into their possession, and held and claimed them as such administrator and administratrix, as a part of the estate of said Henry.

Upon the trial, it was proved, by witnesses introduced in behalf of the plaintiff, that the slaves mentioned and described in said case were inherited by the said Camilla, the plaintiff's intestate, partly from the estate of Hopkins Liptrot, her former husband, and partly from the estate of Aquilla Liptrot, her father; that Henry Talton intermarried with said Camilla, and survived her, and afterwards married again, and died. Camilla left two children: one by her former husband, and the other by the said Henry. The demand of the slaves, and the refusal of the defendant to deliver them, and his possession before and after the commencement of the suit, and that he treated them as his own, together with their value, and the value of their hire, was proven. The plaintiff in error then introduced his letters of administration on the estate of said Camilla, and also a marriage contract between said Camilla and Henry, and John Liptrot, as trustee, (a copy of which marriage contract is attached,*) which were read in evidence to the jury by the plaintiff in error. The plaintiff then proved the intermarriage of said Henry and Camilla, in pursuance of said marriage contract, and closed his case.

---

### * The Marriage Contract referred to.

GEORGIA, } Articles of agreement of three parts, indented, made, and
*Houston county.* } executed, this the twenty-ninth day of May, in the year one thousand eight hundred and thirty-four, between Henry Talton, of the county and State aforesaid, of the first part; Camilla Liptrot (widow of Hopkins Liptrot, deceased,) of the said State and county, of the second part; and John Liptrot, of the said State and county, of the third part: Witnesseth, that whereas the said Camilla Liptrot, as the widow of said Hopkins Liptrot, deceased, is entitled to, and vested with, one half of the estate, both real and personal, of the said deceased, and as the daughter of Aquilla Liptrot, of the county of Washington and State aforesaid, the said Camilla will be entitled to and receive other property, both real and personal: And whereas, a marriage is this day intended to be had and solemnized between the said Henry Talton and Camilla Liptrot, with whom the said Henry is to have and receive the sum of one hundred dollars in money, as for her marriage portion; and the said Camilla Liptrot being desirous of enjoying, maintaining, and keeping, all and singular the lands, negroes and other property, real and personal, which shall be assigned to her, on distribution of the estate of said Hopkins Liptrot, deceased, and also all and singular the property, real and personal, that shall be given to her, the said Camilla, by her said father, Aquilla Liptrot, and also which shall be received by her from her said father's estate, after his death, in case she should then be living, and the increase of said property, separate and distinct from all such property, real and personal, as shall be acquired, claimed or owned, or which is now claimed or owned, by the said Henry Talton, her intended husband, in the event of their intermarriage aforesaid. And the said Camilla Liptrot being further desirous, that all and singular the said property and increase thereof, when assigned, or delivered to, or received by her, as herein-before contemplated, shall be kept and assured to her separate use and enjoyment forever. And the said Henry Talton hereby assenting and agreeing thereto, in consideration of the marriage portion aforesaid, and of the said

DECATUR, AUGUST TERM, 1846. 383

Liptiot, Adm'r, vs. Holmes.

Whereupon the defendant's counsel, without introducing any evidence in support of his plea, moved the court for a nonsuit, on the ground that the legal estate was in said John Liptrot, as trustee, and not as administrator, of said Camilla.

And, secondly, if the plaintiff had any remedy, it was in equity, and not in a court of law.

Which motion the court below sustained, and held, that an administrator took no other title than his intestate had, and stood in the same condition. Plaintiff sued as administrator of Camilla Talton, deceased; and, to prove title, showed a paper, which purported to be articles of agreement made and entered into between said Camilla, then a single woman, Henry Talton, and John Liptrot, in contemplation of a marriage about to be solemnized between said Camilla and Henry, for the purpose of securing to Camilla the enjoyment of her property, free from all control of her future husband, and from all liability to his debts. To effect this object, the property of the said Camilla, by the said deed of agreement, was conveyed to the said John Liptrot, in trust, for the said Camilla; and, by the same deed, the said John Liptrot accepted the trust. The marriage was solemnized between the said Camilla and Henry. The property mentioned in the deed was received, and held, and controlled according to its provisions, during the life of Camilla. She died, leaving a child by said marriage, her husband surviving her. Henry Talton died, in the possession of the property, leaving the child of Camilla by said marriage surviving him. John Liptrot took let-

intended marriage : It is therefore covenanted and agreed, by and between the parties to these presents, in manner and form following ; that is to say, the said Henry Talton and Camilla Liptrot have made, constituted and appointed, and by these presents do make, constitute and appoint, the said John Liptrot trustee for the said Camilla, and for all and singular her property, real and personal, herein-before referred to, and of the increase thereof, to keep, preserve, and assure the same forever, unto the said Camilla, and to her entire and free use, control and benefit, free and exempt from all and every liability, obligation, or charge of any and all judgments, debts, demands, or contracts, now existing, or which shall hereafter exist, against him, the said Henry Talton. And the said John Liptrot hereby accepts the trust aforesaid, and covenants and agrees to and with the said Camilla, that he, the said John Liptrot, will well and truly take charge of, have, hold, and keep and defend in her possession, and for her separate and distinct use as aforesaid, all and singular the said property, personal and real, and for the exclusive use and benefit of the said Camilla: And. that he, the said John Liptrot, will well and truly, and in all things, do and perform all and singular the duties of trustee as aforesaid. And the said Henry Talton covenants and agrees to and with the said Camilla and John Liptrot, that he, the said Henry Talton, will not oppose or obstruct the said John Liptrot, in the due and proper execution of his trust aforesaid, but will render him all necessary aid and assistance in the execution of the same, for and in behalf of the said Camilla.

And for the full, faithful and perfect performance of every part of this agreement, the said Henry, Camilla and John have paid each to the other, the sum of five dollars, in addition to the consideration before expressed, which sum they hereby acknowledge to have received. In witness whereof, they have hereto set their hands and seals, the day and year above written.

Signed, sealed and delivered, in presence of
James M. Kelly,
Edwin Mounger, J. I. C.

HENRY TALTON, [L. S.]
CAMILLA X LIPTROT, [L. S.]
    her mark.
JOHN LIPTROT, [L. S.]

ters of administration upon the estate of Camilla Talton, deceased, and brought the suit; and to show, and prove, title, exhibits this deed.

Camilla Talton, the plaintiff's intestate, at the time of her death, had only an equitable interest in the property; and such interests are cognizable alone in a court of equity. The legal title remains in the trustee, and he alone could sue, and recover, at law; and the court, therefore, awarded the nonsuit. To which decision of the court below the plaintiff in error excepted.

1st. That the court erred in this, that it ruled only an equitable title vested in the plaintiff, as administrator of Camilla Talton.

2d. Because the court erred in ruling that any estate, or title, remained in the said John Liptrot, after the death of Camilla Talton, and grant of letters of administration to the plaintiff.

3d. Because the court erred in ruling that the legal title remained in the said trustee, after the grant of said letters.

4th. Because the court erred in ruling that the plaintiff could not recover said property in trover, at law, against a wrong-doer.

5th. Because the court ruled that the plaintiff's remedy was solely in equity, and not at law.

6th. Because the court erred in ruling that the plaintiff could bring an action at law, as trustee, under said contract.

Upon which exceptions the errors complained of were assigned.

SAMUEL T. BAILEY, for the plaintiff in error.

As this action is predicated on the deed of marriage settlement; or as, rather, plaintiff claims title through that deed; it becomes necessary to first inquire, What estate, or interest, was conveyed, or secured, by that deed, and to whom?

There is no ambiguity upon the deed. It first recites that, as Henry Talton and Camilla Liptrot intended marriage, and she had property in possession, and much more in expectancy, she was desirous to secure it against the debts and contracts of Talton; and that it should be "forever kept separate, and assured to her separate use and enjoyment." Therefore, to effect that clearly-expressed object, they do not anywhere, nor by any expression, convey any property, or title, or interest in the property, to Liptrot; but they say they have "made, constituted, and appointed John Liptrot trustee for the said Camilla, and for all and singular her property, real and personal, to keep, preserve, and assure the same forever unto" (not John Liptrot, but) "the said Camilla, and to her entire and free use, control, and benefit, free and exempt from all and every liability, obligation, or charge of any and all judgments, debts, demands, or contracts, now existing, or which shall hereafter exist, against the said Henry Talton." Here is all the right, title, or interest, which John Liptrot ever had, or acquired, by virtue of this deed. He has no other power than that of a special attorney, to guard and protect the property in Mrs. Talton; no title passed to him, nor was intended to pass. The deed assures the title to Mrs. Talton alone; to her sole and separate use and enjoyment forever. This the law allowed, in spite of Talton's creditors, because he never had any title to, or possession of, the property before marriage; so that it was

competent for him, before any title vested in him, to release and assure, to his intended wife, all her property, in possession or expectancy; and the title, to her, would have been good without any trustee. Equity would have held him a trustee for her. Had such a deed been made after marriage, creditors could have impeached it ; because the title having been once in him, their rights would attach.

Clearly, then, Liptrot was a trustee without an interest. He held a bare office. His duty was, to protect Mrs. Talton and her property against her husband and his creditors ; and, as Talton assented, such an office or agency was lawful and binding. He was to see that she held and enjoyed her property forever. Would not such an agent, or trustee, as they call him, present a singular spectacle in a court of justice, maintaining that he had a better title and right to hold said property, than Mrs. Talton, under this deed ? Well, if Liptrot could not claim, nor hold possession against her, with how much less right has a stranger, like the defendant, to hold the property ?

But, we maintain : 1st, that in those cases where title is conveyed to trustees, to the use of a *feme*, that the absolute legal title is in her, at all times, while she is *discovert ;* that, whenever the coverture ceases, the title to the trustee ceases also. It is upon this principle, alone, that when separate property is given in trust, for a *feme sole*, with an express declaration that she shall not alienate, yet, if there is no limitation over in case of alienation, she may make a good title to the property.—11 *English Ch. Rep. Condensed,* 368 ; 17 *ib. ;* 1 *ib.* 34 ; *ib.* 37 ; *ib.* 40 ; 6 *Eng. Ch. Rep. C.* 461.

Then, if Mrs. Talton had survived the coverture, clearly she would have the absolute title, even if Liptrot had any during coverture. Her administrator has all her rights.

That absolute title vests in trustees, in any case, is more fiction than fact or law ; and since the old feudal system of uses has been virtually abolished, courts have been disposed to look to the substance, rather than the forms of law ; hence, they have held that a *feme covert* may convey her separate property, without the consent of her trustee.— *Saunders on Uses and Trusts*, 344, 345 ; 9 *Ves.* 520 ; 1 *ib.* 189, note ; 15 *ib.* 596, 604 ; 2 *Story, Eq.* sec. 1388 ; 2 *Kent*, 170.

Nor is a separate examination necessary.—13 *Ves.* 191.

Does not this show that there is such a property in her, as would authorize an action of *trover*, when the coverture is removed ?

When a trust is created for a particular purpose, and that purpose fail, a trust results to the original owner, or the heir.—2 *Coke Lit.* $\frac{702}{594}$, *note C* ; 2 *Atk.* 150 ; 1 *Cruise Dig.* 475.

Devise to pay debts after the purpose is fulfilled, the surplus goes to the heir, or remainder-man.—2 *Coke Lit.* $\frac{702}{594}$, *note C ;* 2 *Ves. jr.* 271.

Under a power of appointment to *cestui que trust*, on failure to appoint, the trust results to the donor after end of life-estate.—1 *Dev. and Bat. Eq.* 215.

Devise to A, in trust for B at 21 ; but if B die before 21, without issue, then to A and her heirs forever. A dies before B attains 21 ; held, legal title vested in B, on A's death, and no title remained in the trustee.—4 *Paige R.* 403.

25

If *cestui que trust* die, leaving personal property, and no kin, the property does not vest in the trustee, but escheats.—*Lewin on Trusts,* 294.

Trusts are mere bailments.—*2 Bailey's Rep.* 330.

No one denies that a bailee may maintain trover.

It may be laid down as a general rule, say the Court of King's Bench, in *Doe ex dem. Player* vs. *Nicholls,* that where an estate is devised to trustees for particular purposes, the legal estate is vested in them, as long as the execution of the trust requires it, and no longer; and therefore, as soon as the trusts are satisfied, it will vest in the person beneficially entitled to it.—1 *Barn. & Cres.* 336; 8 *Eng. Com. Law Rep.* 92; 5 *East R.* 162; 1 *Barn. & Ald.* 530; 1 *Keen,* 34; 15 *Eng. Ch. R. Con.* 34; 3 *Beat.* 434; 9 *Paige R.* 110,523.

We believe we have shown—1st, that there never was any title to the property in dispute in John Liptrot as trustee, but that it remained in Mrs. Talton, and on her death vested in her administrator.

2d. That if any title ever did vest in him as her trustee, it ended with the coverture, and vested in her administrator.

But we maintain further, that if Mrs. Talton were alive, she would have such an interest as would sustain trover—2 *Bailey's R.* 330.

Furthermore, we contend, that as Mrs. Talton was proved to have died in possession, a stranger and wrong-doer cannot set up title in a third person, as against her, without going further, and showing that he claims through such third person.—11 *Wend. R.* 54.

Although it is in proof that Talton was in possession of the property after his wife's death, yet it is also proven that he did not take out letters to her, but that the plaintiff did; hence, his possession was tortious, and not in right of his wife, for he is not her next of kin, and the only claim he has to her property, is by virtue of letters of administration: if he holds in any other right, he must answer to her legal administrator.—*Dudley's S. C. R. Eq.* 238; 4 *Dess. R.* 155; 1 *M'Cord Ch.* 514,324; 2 *ib.* 170.

The husband, while in life, would have been entitled, according to late authorities, to administer on his wife's estate; but having died without, her next of kin were entitled.—1 *Williams' Ex.* 244.

As to who will be entitled to this property, on a legal distribution by the administrator, is a grave question, which cannot arise legally now. When it does properly come up for adjudication, we trust to be able to show, that the two orphan children of Mrs. Talton are entitled, and not Talton's creditors, by virtue of his marital rights.

If we believed there was any evidence that plaintiff ever had any title as trustee, and that it did not cease at the death of Mrs. Talton, we would proceed to show that such title was merely equitable, and that on his taking out letters to her, the legal and equitable titles were united in him, and of course he could sustain trover.

We most respectfully contend and believe, that we have pursued the only legal course; that if we had sued as trustee, we should have deserved to have been nonsuited.

Washington Poe, for the defendant in error, based his argument upon the following points and authorities:

1st. Camilla Talton, during her life, had only an equitable interest in

the property secured by the marriage settlement, and could only assert her claim in a court of equity.— *Coke Lit.* 272, *b* ; *Lewin on Trusts,* 9– 15 ; *Willis on Trustees,* 51–55, 109–119 ; 10 *Law Library.*

2d. The administrator of Camilla Talton could have no other or greater int r̄st than his intestate possessed, and as she had an equitable interest, he ṁust have the same.—*Toller on Ex'rs,* 133, *and note* 1.

3d. In the action of trover in this case, the plaintiff suing as administrator, and never having had actual possession of the property sued for, he must resort to the proof of his title, and cannot recover upon a mere possessory right.—2 *Starkie on Evidence,* 832, 833. Consequently, thé only evidence of his title, is tue marriage settlement, and that shows a mere equitable title. Again : the defendant Holmes is not a mere wrongdoer, but holds the property sued for, as administrator of Henry Talton, deceased, who, surviving his wife, became entitled to her estate, and that even without administering.—*Prince's Dig.* 251, sec. 107 ; *ib.* 917, sec. 181 ; *Whitaker* vs. *Whitaker,* 6 *John. R.* 112 ; 1 *Peere Wms.* 378 ; *Squib* vs. *Wynn,* 3 *Atkyns' Rep.* 527 ; *Elliot* vs. *Collier,* 7 *John. Ch. R.* 244. Lord Hardwicke holds, that in such a case the property vests in the husband, before administration granted.—*Elliot* vs. *Collier,* 3 *Atkyns,* 527.

4th. But admitting that Talton could not have perfected his title to his wife's estate without administering, yet the legal estate resided in John Liptrot as trustee, and the death of Camilla did not alter it.—*Lewin on Trusts,* 147, 148, 149 ; 24 *Law Lib.* ; 1 *Shep. Touchstone,* 527, 528.

BAILEY, in reply.

The authorities referred to, by the opposing counsel, do not sustain his position. Trusts were not well understood in England, in early times : hence so many inaccurate expressions of the courts and bar. The ancient feudal doctrine of uses being abolished, simple trusts were resorted to, as in some sort to supply their place ; and when applied to the complex system of conveyancing in England, touching the fee of real estate, it renders trusts there wholly different from anything known in practice here. But when applied to personal estate, or chattels real, the practice in both countries is the same ; the absolute fee never vests in the trustee.

The questions raised, and decided in the reported cases, read by the counsel for the defendant in error, were wholly different to the one now at bar. The questions in these cases were, what right the husband had to his wife's property ? Not how he should acquire or perfect those rights. They speak of the property vesting in him on her death, and say that it vests even without and before administration ; but they nowhere say that this right is perfect until he takes it through an *administration ;* his right then vests in possession. It is like saying, that on the death of an intestate, his property vests in his wife and children, and yet it does not vest legally in possession until administration. This is the doctrine sustained by the very cases read by the opposing counsel. In the case read from 6 *Johnson's Reports,* Spencer, Judge, says expressly, that he decides that case upon its equitable circumstances. The plaintiff was not the administrator of the wife ; her husband, therefore, had a better right in equity than he ; but he declares, that if letters of administration should be

taken out to the wife, he would be entitled in law to reduce all her property to possession, and on a distribution, the rights of the husband would have to be vindicated. The case in Peere Williams, is .to the same effect. None of the authorities sustain the doctrine, that an administration is unnecessary. When they speak of the husband's rights by survivorship, they mean his ultimate title ; his rights through an administrator ; whereas, if she had survived him, her property would have gone to her next of kin, and not to his. But where those learned judges speak of his being next of kin of his wife, they use an unguarded expression.

That administration is in all cases necessary, we refer to *Dudley's S. C. Eq. Rep.* 238 : 4 *Dess. Eq. Rep.* 155 ; 1 *McCord's Eq.* 514, 324 ; 2 *ib.* 170.

*By the Court*—WARNER, Judge.

This was an action of trover, brought by the plaintiff in error, to recover the possession of fourteen slaves. It appeared in evidence at the trial, the negroes in controversy were the property of the plaintiff's intestate, before her intermarriage with Henry Talton. That, prior to the marriage with him, she entered into a marriage contract, by which the aforesaid property was secured to her *sole and separate use.* It also appears, from the record, Henry Talton survived his wife Camilla, the plaintiff's intestate, married again, and then died. The plaintiff's intestate left two children, one by her former husband and one by Henry Talton. The plaintiff then proved the conversion of the negroes by the defendant, *their* value, &c.; then read his letters of administration to the jury, the marriage contract, proved the marriage of the parties thereto, and closed his case. The defendant then moved the court for a nonsuit, on the ground the plaintiff's evidence showed the legal title to the property was in *John Liptrot*, as *trustee*, under the marriage contract, and not in said John Liptrot as the administrator of Camilla Talton. Which motion the court sustained, on the ground that the plaintiff's intestate, at the time of her death, had only an *equitable* interest in the property, and that such interests are cognizable alone in a court of equity. To this decision of the court below, the plaintiff excepted, and now assigns the same for error in this court. The plaintiff has made general specifications in his assignments of error, but they all amount to the same thing in substance, and will be all considered together. To enable the plaintiff to maintain trover for the property in dispute, he must have had either a general or special property therein, the actual possession, or the *right of possession.*—*Holcombe* vs. *Townsend*, 1 *Hill's So. Ca. Rep.* 399.

The whole interest of the intestate's personal estate vested in the plaintiff as her administrator, on the grant of letters of administration; and such grant has relation *to the time of the intestate's decease.*—*Toller's Executors*, 133. Was there such an interest then vested in the plaintiff, as the administrator of Camilla Talton, as would entitle him to maintain an action of trover against the defendant, who is a mere stranger, so far as the evidence shows ? It is true, the defendant's plea exhibits him in a different capacity, but that is no part of the testimony. It is conceded that the plaintiff's intestate held this property in her own right. Anterior to her marriage with Henry Talton, the title to it *was*

*vested in her.* What has she done, prior to her death, to pass that title out of her? The defendant in error insists, she conveyed the title to John Liptrot, as trustee, by the marriage contract, and so the court below seems to have thought; but we have bestowed the most careful attention upon that marriage contract, and have not been able to find any words therein, which can be construed so as to pass the title out of her, and vest the same in him as trustee. After reciting the desire of the said Camilla, to secure the property for *her sole and separate use, free from the control of said intended husband,* it is further stipulated in said contract, that "the said Henry Talton and Camilla Liptrot do, by these presents, constitute and appoint John Liptrot *trustee* for said Camilla, and for all and singular her property, real and personal, hereinbefore referred to, and the increase, to *keep, preserve, and assure the same forever unto the said Camilla,* and to her entire and free use, control and benefit, free and exempt from all and every liability, obligation or charge, of any and all judgments, debts, demands or contracts now existing, &c. : And the said John Liptrot hereby accepts the trust aforesaid, and covenants and agrees to and with the said Camilla, that he will well and truly take charge of, have, hold, and keep, and defend, in her possession, and for her separate and distinct use as aforesaid, all and singular the said property, personal and real, and for the exclusive use and benefit of the said Camilla; and that the said John Liptrot will well and truly, and in all things, do and perform all and singular the duties of trustee as aforesaid." The instrument, it will be perceived, appoints him *trustee ;* but there are no words of *conveyance* used, to pass the title of the property from her to him, as such trustee. How far a court of equity would have carried out the intention of the parties, and enabled him to protect the property against the marital rights of the husband, it is not now necessary to decide. Conceding, however, there are words in the instrument, conveying to John Liptrot the legal title to the property, for the *purposes specified in the contract,* yet, at her death, the objects and purposes of the trust were *fully executed.* What were the objects and purposes of the trust? Why, to protect her in the free and separate control and enjoyment of the property, during her coverture with Henry Talton ; and the moment the coverture was dissolved, by the death of either party, the objects of the trust, as well as the *intention* of the parties, was fully answered. Whatever opinions may have prevailed at one time, in regard to the right of a *feme covert,* to alienate and dispose of her separate property, it is now well settled, she has that right, without the intervention of trustees; for such power is incident to such ownership.—2 *Kent's Com.* 171 ; *Clancy's Husband and Wife,* 354–5 ; *Fettiplace* vs. *Gorges,* 1 *Ves. Jr.* 46 ; *Essex* vs. *Atkins,* 14 *Ves.* 542, 547 ; *Jacques* vs. *Methodist Episcopal Church,* 17 *Johns. R.* 577. In *Fettiplace* vs. *Gorges,* Lord Thurlow says: "I have always thought it settled, that from the moment in which a woman takes personal property to her sole and seperate use, from the same moment she has the *sole and separate right to dispose of it.* Upon the cases, I have always taken this ground : that personal property, the moment it can be enjoyed, must be enjoyed *with all its incidents.*"

At the time of the death of Camilla Talton, she was the owner of the property, and could have alienated the same without any authority

from John Liptrot, the supposed trustee, even admitting the title had been conveyed to him for the purposes mentioned in the deed. It was her *separate property*, and was enjoyed by her, "*with all its incidents;*" one of which is, that at her death, it passes to and vests in her legal representative, who is the plaintiff in error.—*Bradly* vs. *Hughes*, 11 *Eng. Ch. Rep.* 368; *Tullet* vs. *Armstrong*, 17 *Eng. Ch. R.* 17, 32. In *Jones* vs. *Cole*, 2 *Bailey's Rep.* 330, the same principle involved in this case was discussed and settled, so far as it regards *the execution of the trust.* That was an action of trover for two slaves. The plaintiffs gave in evidence a deed, executed by their mother, Anna Jones, afterwards Cole, by which she conveyed the slaves in question to Samuel Hughes, *in trust for her separate use* during her life; and after her death, for the *use of the plaintiffs;* and by a subsequent clause, appointed him to act as *trustee for the plaintiffs,* as well as herself. Samuel Hughes accepted the trust, and afterwards, being about to remove from the State, in pursuance of a power vested in him by the deed, assigned his trust to John Jones. The donor died in December, 1824. The defendant moved for a *nonsuit*, on the ground that the action should have been brought in the name of the *original, or substituted trustee.* But the presiding judge held, that the trust became *executed* at the death of the donor, and the plaintiffs, who were the *cestui que trusts*, were entitled to maintain this action in their own names; and his decision was sustained by the Court of Appeals, on the ground that, after the death of the donor, there was nothing to be done on the part of the trustee, to invest the plaintiffs with the title to the property. The object of the trust had been answered, as in this case. There was nothing to be done on the part of Liptrot, the supposed trustee, to pass the title to the legal representatives of Camilla Talton; her title to the property was perfect and complete, without any conveyance from him. In the case of *Jones* vs. *Cole*, the title to the negroes was conveyed by Anna Jones to the trustee, for the separate use of herself during life, and, after her death, for the use of the plaintiffs. The same position was assumed in that case as in this, that the *legal title* to the property was in the trustee, and therefore the suit should have been brought in the name of the trustee; but the court held, in that case, there was no conveyance necessary on the part of the trustee, to invest the *cestui que trusts* with the right of property, to maintain trover therefor.

Although the slaves were expressly conveyed to the trustee by deed, by the then owner, Anna Jones, in trust for the use of the plaintiffs, after her death, yet, the court held, the trustee had only a special property in the slaves, which terminated at the death of the donor, the object of the trust having been executed. So here, the object of the donor, or creator of the trust estate, in John Liptrot, (if you please to call it such,) was fully answered, by having the property protected against the marital rights of Henry Talton, during the coverture, according to the true intent and meaning of the parties to the instrument; and when the coverture was determined, by the death of the donor, the right of possession, as well as the right of property, vested in her legal representative. The trustee had no longer any interest in the property, after the dissolution of the coverture; his interest, and his only interest, in the property was, to protect it for the sole and sep-

arate use of Camilla Talton, during her coverture; and had Talton died first, there would have been no further use for his services as trustee, to protect the property as against him; and her dying first, does not make any difference; *the trust was fully executed, so far as his interest as trustee was concerned in the property.* It was contended, that, inasmuch as the wife died first, the title to the property vested in her husband, under the act of 26th December, 1827.—*Prin. Dig.* 251. To have given him a right to the possession of the property, under that act, he should have taken out administration on his wife's estate. There must always be an administration, for the reason there may be debts to be paid. The question of conversion was discussed in the argument, by the counsel for the defendant in error, and we will express an opinion upon it, although it does not appear necessary, in the present stage of the case; but it may become important, in its further progress, and it is the object of this court to prevent litigation, as far as possible. A conversion may consist in a *tortious* taking of a chattel, or in a wrongful assumption of property in it, or in making an illegal use of it; if there be a deprivation of property to the plaintiff, it will constitute a conversion, though there be no acquisition of property by the defendant.—2 *Leigh's Nisi Prius,* 1477. A party may be guilty of a conversion, by dealing with, or claiming property in goods as his own, or even by asserting the right of another over them.—*ib.* 1480.

The action of trover being founded on a conjunct right of property and possession, any act of the defendant, which *negatives, or is inconsistent* with such right, amounts in law to a conversion. It is not necessary to a conversion, that there should be a manual taking of the thing in question by the defendant: it is not necessary that it should be shown, that he has applied it to his own use. Does he exercise *a dominion over it, in exclusion, or in defiance of the plaintiff's right?* If he does, that is in law a conversion, be it for his own or another person's use.—6 *Bacon's Abr.* 677; *Bristol* vs. *Burt,* 7 *Johns, Rep.* 258; *Reid* vs. *Colcock,* 1 *Nott* and *McCord's Rep.* 600; *Reynolds* vs. *Shaler,* 5 *Cowen's Rep.* 323. But it is said, where a party comes *lawfully* into the possession of property, there must be a demand and refusal proved. This is undoubtedly true where the defendant finds the property, or where he gets possession of it, by the *consent of the plaintiff;* the possession must be lawful as *against the plaintiff.*—2 *Phillips' Ev.* 225. Demand and refusal is only *evidence* of a conversion.—*ib.* 226. But where the defendant gets possession of property, as administrator, in right of his intestate, or where he gets possession of it as a purchaser, at sheriff's sale, under an execution against some third person, and uses and exercises dominion over the property as his own, it is a conversion, as against the rights of the plaintiff, who is a *stranger to the title, under which the defendant claims.* Although the defendant may obtain the possession of property under legal process, yet, if he assert a title or claim *hostile* to the plaintiff's right or title, under such legal process, it is a conversion as *against the plaintiff.*—*Hutchins* vs. *Bobo,* 1 *Bailey's Rep.* 546; *Tompkins* vs. *Haile,* 3 *Wend. Rep.* 406; *Bates* vs. *Conkling,* 10 *Wend.* 389; *Summerset* vs. *Jarvis,* 7 *Eng. Com. Law Rep.* 322. What is meant by defendant coming *lawfully* into possession of the property is, where he finds it, and retains it for the true owner: or where he

obtains the possession of the property, by the *permission or consent* of the plaintiff, as where the relation of bailor and bailee exists. In this latter class of cases, a demand and refusal would be necessary, unless it could be shown the defendant had appropriated the article so found to his own use, or had disposed of the property bailed, contrary to the terms and stipulations of the contract of bailment. Our judgment, therefore, is, that the court below erred in nonsuiting the plaintiff, on the statement of facts presented by the record, for the reasons already given. Let the judgment of the court below be reversed, and the case reinstated.